NOAH E. MARTIN, RESPONDENT, v. J. W. FICKLIN, APPELLANT.—227 S. W. 2d 69.

Kansas City Court of Appeals. Opinion delivered February 6, 1950.

*Lyman M. Cleek* for appellant.

1228

*Edwin C. Orr, Don Bruton* and *Carl F. Sapp* for respondent.

DEW, J.—The respondent, owner of a grocery store in Moberly, Missouri, brought this action to recover $1000, represented by the check of the appellant in that amount alleged to have been given by appellant as earnest money and as part payment on a contract to purchase the store and merchandise therein, on which check appellant stopped payment and, it is claimed, repudiated the purchase contract. Punitive damages were also sought by the petition, but not submitted to the jury. Judgment was for the plaintiff for $1000, with interest. The defendant appealed.

The respondent and the appellant will, for convenience, be hereinafter referred to, respectively, as the plaintiff and the defendant.

The plaintiff's petition alleges that plaintiff and defendant, on March 30, 1948, entered into a contract in writing whereby plaintiff agreed to sell and defendant agreed to buy the grocery business, good will and fixtures owned by plaintiff at Moberly, Missouri, for $8000, and the stock on hand therein at cost price; that at the time it was also agreed that defendant would pay to plaintiff $1000 "as earnest money and as a part of the $8000 purchase price, and as evidence of good faith in making said agreement, and as evidence of his willingness and intention to complete said agreement"; that thereupon defendant did give to plaintiff a check for $1000 to be applied on the purchase price aforesaid, the balance of the $8000 to be paid the next day, March 31, 1948, and that the stock of merchandise was to be thereupon inventoried and turned over to the defendant at cost; that

defendant failed and refused to complete the contract, but the next day, March 31, 1948, stopped payment on the $1000 check, which the plaintiff had, in due course, deposited for clearance, and which had twice been presented for payment and refused by defendant's bank; that demand was thereafter made upon defendant to pay said check, which defendant has failed and refused to do. The petition further alleges that plaintiff does not have possession of said contract, but that the same is in the possession of the defendant, and plaintiff can not file the same with the petition. A copy of the check is attached, dated at Columbia, Missouri, March 30, 1948, drawn on the Exchange National Bank of that city, for $1000, payable to Noah E. Martin, or order, signed "J. W. Ficklin". The prayer was for judgment for $1000, with interest and punitive damages.

The defendant filed a motion to dismiss the petition because of insufficiency of the facts pleaded. The motion was overruled.

The answer challenges the sufficiency of the petition to state a cause of action; admits the giving of the check described, and the stopping of payment thereof; avers that it was wholly without consideration; that it constituted no payment for any of the purposes alleged in the petition; denies that there was any agreement in writing signed by the parties; avers that plaintiff had fraudulently represented to defendant that plaintiff's employees in the Moberly store would remain on their jobs for at least 60 days from April 1, 1948, although he knew that they would quit their employment about that date; that defendant relied on said misrepresentation to his detriment, and was thus induced to enter into the alleged contract and to make and deliver said check; that he would otherwise not have made such arrangement or issued said check, as plaintiff well knew; that defendant elected to declare the agreement canceled by reason of the fraud; that he has demanded a return of the check, but plaintiff has refused; that if there were any such agreement, as alleged, it was mutually rescinded; that the alleged contract stipulated that plaintiff's employees would remain and plaintiff was unable to perform that condition precedent, which was of the essence of the contract, thus permitting rescission. The other allegations of the petition were generally denied.

On account of the points here made it is necessary to set forth with a considerable decree of particularity the evidence produced. The plaintiff testified that he was the owner and operator of a grocery store in Columbia, and also owned a grocery store in Moberly, Missouri; that for some time prior to March 30, 1948, he had been negotiating with defendant for the sale of the Moberly store; that late in the afternoon of March 30, 1948, the defendant made him a counter offer of $8000 for the Moberly store, plus the cost of the stock on hand on inventory; that thereupon the parties went to the office of the defendant's brother-in-law, an attorney in Columbia, to have

the necessary papers in the transaction drawn up; that the attorney announced that his secretary had gone for the day, and that memorandums would be made of the transaction and would be typed the next morning when the parties could come in and sign them so each could then have a copy; that the attorney made two separate memorandums in longhand, one the agreement and the other the bill of sale, including a partial list of fixtures; that both parties then placed their initials upon the memorandums; that the papers were left with the attorney, with whom the parties were to meet again next morning; that plaintiff never saw the papers again, although he asked for them the next morning; that before going to the attorney's office on March 30th, defendant called his wife and also his banker and announced that he could make arrangements for the money; that upon arrival at the attorney's office that evening, defendant told the attorney that he had bought plaintiff's store, and ordered the necessary papers drawn; that the inventory was to be made the next day; that plaintiff remarked he had sold the store "too cheap", that "you had better tie me up on this thing or I will sleep on it and back out in the morning"; that the attorney said to defendant: "J. W., I think you should give him a payment on these fixtures now so as to bind the agreement". He said the attorney had written on the memorandum: "Whereas, I, on such and such a date, have sold to J. W. Ficklin", then described the location and amount decided upon, asked the parties to place their initials at the bottom, and then said to the defendant: "J. W., you write him a check for $1000", which was done. The check introduced in evidence was of the same tenor and effect as the alleged copy thereof attached to the petition. The attorney then said: "Now, Noah, you have sold something, and J. W., you have bought something". The parties then left and the plaintiff 'phoned his manager at Moberly to stay after hours the next day and help invoice the store, and called his landlord and arranged for him to accept the defendant as the new tenant in the building. Plaintiff further testified that it was agreed that he should receive the remaining $7000 the next morning for the store and fixtures; that while in the conference, the defendant received a telephone call, and then said that Mr. Thurston of his bank had approved the necessary credit for the deal; that the check for $1000 was given to "bind the deal" and as payment on the fixtures, and was accepted as such.

Plaintiff further testified that defendant called him early the next morning and said: "I have hit a snag", and asked plaintiff to come a little early to the attorney's office. When the attorney arrived, defendant again stated: "I have hit a snag". The defendant stated that his wife objected to the purchase; that she thought the defendant was working too hard and she would not consent to his taking on any more business. The attorney suggested that defendant take a few days to talk to her and see if she would not change her mind. It was then

suggested defendant might know of another party who would like to buy the store. Plaintiff remarked that he had no objection to waiting a few days for defendant to pacify his wife. He told defendant he did not object to defendant's "turning over his part of the deal to someone else if they wanted to continue the same deal'.', and gave defendant permission to talk to several other persons about "taking over his part of the store". Plaintiff also suggested another party, whom he contacted a few days afterwards, to see if that person would be interested in taking over defendant's interest in the agreement, but he already had a store and was not in position to take on another.

Plaintiff testified that he was never asked to return the check to defendant at any time; that after the last conference at the attorney's office when he left with the understanding that defendant wanted to "pacify" his wife with the deal, plaintiff went to his own bank and deposited the check in the usual course of business; that he had not been told the payment had been stopped on the check and did not know it until he was notified by his bank later that the check had been returned because payment had been stopped. Plaintiff called the defendant, and defendant said it was "best that way", "the way things were", and plaintiff said he was going to put the check through again and would expect it to be good "this time", and defendant replied: "Wait a few days". Later plaintiff called defendant, who said: "You send the check back through and it will be all right". Again the check was returned to the plaintiff, whereupon he took it to the plaintiff's bank and presented it in person, and payment was again refused. He again called defendant, who told him: "He would see me in hell before he would pay the check". ·

Upon cross-examination plaintiff said the manager of his Moberly store was a trusted employee, though he would not call him a valuable asset to the business of the store; that the manager had talked some of buying the store, but told him he wished to go into the beer business, but would not leave until it was convenient to the plaintiff; that another employee had quit him; that he discharged another employee on June 26, 1948; that another employee quit nine months after the transaction with defendant; that two other employees—Ed and Wilbur Short—quit April 3, 1948, the latter having been with him for nearly two years; that a meat cutter and another had quit in March of that year. Plaintiff further stated: "I accepted the money as part payment and I was bound by the contract for which this money was given, and I understood the contract to be binding, and part payment on the fixtures, and I accepted it that way". He was asked if he had intended to give defendant credit for the $1000 when he received the check, or to credit it when he cashed the check. He answered: "I received that thousand dollars as a thousand dollars, the same as I would have received a thousand dollar bill. * * * I

figured J. W. Ficklin had $1,000 in the bank and I had heard him talk to his banker and I figured it was just the same as $1,000. I would have given a check,—I don't carry thousand dollar bills around with me. * * * I credited him at the time he gave me that check for $1,000. As far as I was concerned, it was my $1,000 right then''. He said he contacted some prospective purchaser for the store because defendant ''asked me to''. He said he finally sold the store the following January, 1949, because he did not want to continue paying the bills after April 1st. He said the attorney had mentioned the Bulk Sales Law at the time of the conference; that plaintiff was willing to comply with those requirements, and supposed that would be done the next day after the agreements were typed. He stated that he did not ask the attorney for copies of the memoranda for the sale. He understood the defendant was postponing the consummation of the deal for a few days; that he had confidence in both the defendant and the attorney and ''It didn't enter my head to ask for those copies at that time''. He denied calling defendant on March 31st and offering him a truck in return for the $1000 check.

The cashier of defendant's bank testified that he had told defendant he could arrange $8000 to be available to defendant to make the purchase. He said at 8:00 o'clock on the morning after the check was made, defendant called him at the bank or at his home and ordered the payment to be stopped. Another witness said defendant asked him about March 29th, and previously, if he would work for him as manager of the Moberly store; that defendant was interested in buying it; that defendant offered terms for such employment; that witness was not able to get permission from his superiors at St. Louis to take the new position. He said he so reported to defendant on April 1st and defendant told him he had bought the store on an offer ''so ridiculous'' that he did not ''think plaintiff would accept, but he did''. Defendant did not say anything about having any difficulty in finding employees to work for him in the Moberly store.

Certain parts of defendant's deposition were introduced, wherein he had testified that after he had explained the terms of the agreement, the attorney had made a memorandum on the back of a blank check; that the parties did not sign the papers; that he signed the $1000 check and gave it to the plaintiff during the conference; that he had arranged with his bank for cash to finance the deal; that the following morning he stopped payment of the check, telling the bank that certain things had come up and he thought it not advisable to complete the deal; that to finance the deal ''was possibly a $20,000 arrangement''.

The defendant, owner of several grocery stores in Columbia, testified of the extended negotiations between the parties for the purchase of the store; that plaintiff first asked $12,500, plus the stock at cost; that he and his wife went to Moberly and saw the store;

that shortly before he and the plaintiff met in the attorney's office he went with the plaintiff to Moberly and looked over the store; that he later made an offer of $8000 cash, plus inventory; that at no time did either party sign any written agreement; that plaintiff assured him that the employees were capable and that he would guarantee each would stay for six months, even if plaintiff had to pay extra from his own pocket to get them to do so; that witness would not have considered buying the store without such assurance; that when he and plaintiff arrived at the attorney's office the evening of March 30, he told the attorney that the parties were going to negotiate a contract at that time for the purchase of the store in Moberly, and asked him to draw up the necessary papers to make it legal. The attorney took notes on a blank check; that the parties did not sign them; that plaintiff first asked for payment of the $8000; that defendant said he did not have it and would have to arrange with the bank; that plaintiff then asked for $5000, which defendant declined to pay; that plaintiff then said: "Give me something to make the contract good", and defendant said: "'I will give you a $1000 check now and you bring it back tomorrow'—I gave him the $1000 check inasmuch as the purchase price was to be paid at the consummation of the contract and he would,—* * * he was to hold the $1000 check until tomorrow in the office when the papers were signed, and I would give him an $8000 check, chargeable against the account in the bank, which I was to open with the borrowed money. * * * It (the check) was to be returned when he got the check for $8000. * * * It was to be returned in its place. I was to give an $8000 check when the contract was executed, Bulk Sales Law and all was complied with"; that he told plaintiff all this, and plaintiff said: "O. K." He said the attorney then told them to come in at 9:30 o'clock on the next morning when the papers would be typed and signed before going to Moberly to invoice the stock; that the plaintiff was to furnish a list of his business creditors.

Defendant further testified that he told his wife of the transaction the evening of March 30th and she said defendant already had too much business to take care of; that she would have to go back to business and that, from a woman's intuition, she felt something was wrong with the deal when a man would come down from $12,000 to $8,000 in a few hours. He said that when he went to the attorney's office the next morning he did not intend to sign the contract and so stated, because he had found out that plaintiff's manager and several other employees were going to leave, and on account of his wife's health it was not advisable to go on; that the attorney had 'phoned him after the conference, about midnight, that plaintiff's manager and several other employees at Moberly were going to leave. Defendant said that the plaintiff remarked the next morning that defendant's home life came first; that he was selling the store too

cheap anyway, and could possibly get more for it. He said the attorney suggested that plaintiff might sell to some other person and several persons were mentioned,·and plaintiff asked defendant to help him sell the store to someone else; that each was to contact certain persons; that the attorney said to plaintiff: "Noah, have you got that check?" and plaintiff answered: "No, I haven't", to which the attorney replied: "Well, you want to bring it back and give it to him", and plaintiff said: "I will". Defendant admitted having talked on March 29th to a prospective manager for the Moberly store and on account of that person's failure to take the job he desired that plaintiff's employees stay on. · He said that on March 31st plaintiff called him and offered him a truck for the $1000, which the defendant said would be agreeable, and plaintiff replied: "O. K. I will let you know".

Defendant denied that he intended plaintiff to keep the check and that there was ever anything said about any exchange of money if the deal did not go through; that at the conference at the attorney's office on March 30th he mentioned that his wife was his partner in the business and her signature would be required on the loan at the bank and on "the note for $8000 that we were to give Mr. Martin that he would carry back"; that she was to sign the contract for the store when written up, and the plaintiff was so advised; that when he gave the check he told plaintiff he would have to give him a proper check on the firm name for the Moberly store on such account to be opened the next day.

On cross-examination defendant testified that when he negotiated for the store he was acting for the partnership of himself and wife, and intended to bind both; that either was authorized to draw a check on the business account. When asked why he did not tell plaintiff on the morning of March 31st at the attorney's office that he had just stopped payment on the check he said: "There was no reason for it". He said he did tell plaintiff he would not pay the check when plaintiff called him after the check returned, but denied saying he would see plaintiff "in hell first". He said he had tried to get a manager for the store because plaintiff had told him ·he might not like plaintiff's manager, but that the present manager would stay as long as plaintiff told him to. He said, relying on the message that some of plaintiff's employees were going to quit, he determined to stop payment on the check and ·call off the agreement. He said whatever obligations he incurred with plaintiff were also his wife's.

Plaintiff's former manager, a witness for defendant, testified that he had worked for the plaintiff about two years before March 31, 1948; that he had talked to plaintiff about buying the store 45 or 60 days before April 1, 1948. · He gave plaintiff notice he would quit ·on that date in order to go into the wholesale beer business; that one Haddock had quit two weeks before, and the brother of witness and

one other had quit April 1; that he did not know whether or not the others had given plaintiff any notice.

The secretary of the attorney mentioned, testified that on the morning of March 31st, she saw some notations he had made on a piece of paper, and saw him crumple it up and throw it in the wastebasket.

On rebuttal, the witness whom defendant said he had asked to manage the Moberly store and who had declined the offer, testified that on April 1st, defendant told him he had bought the store; that since the suit was filed defendant told him he was going to use the defense that there was no contract, and that some time later he told him he was going to admit there·was a contract, but·was going to defend on the ground that some of plaintiff's employees quit; that defendant told him he had never made any contract with plaintiff.

Plaintiff, being recalled, said he had had about 15 employees in the store at Moberly; that his manager quit April 3rd, and had told plaintiff of such intention, and that witness had so informed the defendant; that the manager was going into the beer business and his brother quit with him; that a delivery boy quit June 26th. He denied ever telling the defendant that any of his employees would continue in his employ. He denied the conversations with defendant about letting him have a truck for the $1000 check. He said either one of the trucks was then worth considerably more, and that the truck had nothing to do with the $1000 check.

At the close of all the evidence, defendant moved for a directed verdict on the ground of insufficient facts alleged in the petition to warrant the relief asked, and the insufficiency of the evidence to warrant a verdict for the plaintiff. The motion was overruled.

Defendant's points are (1) that the court erred in overruling defendant's motion to dismiss the petition for failure to allege a forfeiture or an agreement for liquidated damages or any actual damages, delivery or tender of the goods, ability and willingness of plaintiff to perform, or a breach by the defendant; (2) that the court erred in not sustaining defendant's motion for a directed verdict on the grounds that forfeiture or liquidated damages were not pleaded or proved; that the check was not a payment until cashed, and was not a consideration for the alleged contract, and there was no evidence that warranted a recovery of $1000; that plaintiff's evidence shows he retained and operated the store and later sold it to third parties, treating the transaction as abandoned and rescinded, and his only remedy is for damages; there was no proof of damages; there is no proof that plaintiff offered to perform his part of the alleged contract, or to deliver the goods, but before trial, sold the store to others; (3) the court erred in giving plaintiff's Instruction "P-1" and in refusing defendant's Instructions "D-5" and "D-6".

All the allegations of the petition must be assumed as true in considering defendant's motion to dismiss it. It alleged the contract of sale; that it was in written form and signed by the parties; that when the same was entered into, a payment was demanded by plaintiff as earnest money, as evidence of defendant's good faith and willingness to complete the sale, and as a part payment on the contract price; that thereupon defendant paid to the plaintiff a check for $1000 as a cash payment for the above purposes, and that it was accepted by plaintiff as such; that defendant, the next morning, stopped payment on the check, refused to pay it and refused to perform the contract of purchase as a whole. Such a contract, as pleaded, must be considered valid. It was not only in writing, but a substantial payment was made on the contract price. It was a valid consideration for the check. A part payment on a contract can be made by check when intended and accepted as such, as effectively as by cash. Coffman v. Fleming, 301 Mo. 313, 256 S. W. 731. That allegation was one of fact to be determined, under the evidence, as any other fact. Under such circumstances, as pleaded, the drawer cannot obviate his liability for the check by the mere stopping of payment thereof. The check in question contained all the elements of a negotiable instrument, was unconditional upon its face, and imported a valuable consideration therefor. Di Franco v. Steinbaum, 177 S. W. 2d 697, 701; Maryland Casualty Co. v. Dobbin, 232 Mo. App. 557, 573; 108 S. W. 2d 166, 176. That the check was for earnest money is specially pleaded, the amount of the payment was not out of proportion to the total price so as to conflict with the "earnest money" construction. That the payment was to be regarded as liquidated damages to be forfeited in event of failure on defendant's part to carry out the contract is plainly inferred. Koelling v. Bank of Sullivan, 220 S. W. 2d 794, 795. Nor was it necessary to plead delivery or tender of the property to be sold, since a buyer who has wholly repudiated a contract, without fault on the seller's part, is not entitled to delivery. Under such circumstances the vendor may treat the contract as at an end. Armstrong v. Dunn, 163 Mo. App. 701, 147 S. W. 509, 510; Montgomery v. Wise, 120 S. W. 100, 104, 55 C. J. p. 1026. Neither was the plaintiff required to plead specially his willingness and ability to perform his part of the agreement, since the petition avers his ownership of the property and his agreement to sell, and the reasonable inferences to be drawn therefrom are that he was willing to and could perform the contract on his part. In our opinion the petition stated sufficient facts to warrant the relief prayed for, and that the court properly overruled the motion to dismiss.

As to the proof of the essential facts pleaded, raised by the defendant's motion for a directed verdict, we look to plaintiff's evidence most favorable to him, and to such of the defendant's evidence as may tend to establish the plaintiff's case. There was substantial

evidence of the written contract and its terms; that in connection therewith and in consideration thereof defendant gave to the plaintiff the $1000 check as earnest money and as a cash payment to be applied on the total purchase price; that it was so accepted and credit was so given; that, without fault on plaintiff's part, defendant stopped payment on the check the next morning after giving it, and refused to pay it, and wholly repudiated his agreement to purchase. All these elements were issues of fact to be determined by the jury. Under the same facts the defendant could not have recovered the check or its proceeds. Doerner v. St. Louis Crematory & Mausoleum Co., 80 S. W. 2d 721, 723. Defendant's motion for a directed verdict was properly overruled by the trial court.

Defendant contends that under the evidence the plaintiff must be held to have abandoned and rescinded the alleged contract because he later sold the store to a third person. The plaintiff sold the store to a third person eleven months after the transaction with the defendant. When a buyer refuses to conclude a contract of sale and repudiates it without fault on the seller's part, under the circumstances here shown the seller may treat the contract as at an end and may retain the property. In a cash sale, delivery and payment are concurrent, and without the payment, the title does not pass unless there is a waiver or laches on the seller's part. Commercial Credit Co: v. Interstate Securities Co., 197 S. W. 2d 1000, 1005. Plaintiff's later resale of the property did not affect his action for payment of the check for the earnest money. 55 C. J. p. 1025.

Defendant's third point is that "the court erred in giving to the jury respondent's Instruction 'P-1' ". No grounds are assigned, the point is not directly argued in the brief, and, therefore, we are not required to consider it. Petty v. Kansas City Public Service Co., 355 Mo. 824.

Defendant's fourth point is that the court erred in refusing to give defendant's Instruction "D-5" on the grounds that plaintiff's case was based on a written contract, and if entitled to recover at all, it was upon the terms and conditions of the specific contract, and then only after he alleged and proved a written contract, a breach thereof, and actual damages resulting therefrom. That instruction would have told the jury that in order to recover, plaintiff had the burden to prove that the contract was in writing; that defendant failed and refused to perform his part of it, and that because of the breach, plaintiff sustained actual damages. The court had already given defendant's Instruction "D-1" to the effect that if the jury found that a written contract was never actually executed by the parties, that the plaintiff could not recover. By plaintiff's Instruction "P-1", a verdict for the plaintiff was conditioned among other things, upon the finding by the jury that the defendant had stopped payment on the check, given as earnest money, and to apply on the purchase

price, and had refused to pay the same, and to complete the contract according to its terms. Under defendant's Instruction "D-3", as a condition of a verdict for the plaintiff, the court required the jury to find, among other things, that the check was given with the understanding that if the defendant did not consummate the transaction, the plaintiff could keep the proceeds of the check, as liquidated damages and as a forfeiture of the failure to comply with the terms of the contract. An instruction on actual damages was not proper. The court did not err in refusing to give defendant's Instruction "D-5".

Defendant's fifth point is that the court erred in refusing his Instruction "D-6" for the reason that there was no allegation or proof of a forfeiture or liquidated damages, and it was plaintiff's burden to prove actual breach of a written contract, as well as actual damages resulting therefrom. The requested instruction required the jury to find in favor of defendant, unless they found that a written contract was entered into by the parties, breached by the defendant, and actual damages thereby sustained because of such breach, and, further, that the check for $1000 could not be considered as a measure of damages unless actual damages were sustained. The matters raised by this instruction, so far as they were applicable under the law to this case, were fully covered by other instructions given.

Finding no error in the trial of this cause, materially affecting the merits, the judgment should be affirmed. It is so ordered. All concur.